TRAVCO INSURANCE COMPANY,
Plaintiff,

v.

Larry WARD, Defendant.

Civ. No. 2:10cv14.

United States District Court,
E.D. Virginia,
Norfolk Division.

June 3, 2010.

Wystan Michael Ackerman, Robinson & Cole LLP, Hartford, CT, for Plaintiff.

Jeffrey Arnold Breit, Breit Drescher & Imprevento PC, Norfolk, VA, for Defendant.

### ORDER & OPINION ON MOTION FOR SUMMARY JUDGMENT

ROBERT G. DOUMAR, District Judge.

This matter comes before the Court on a Motion for Summary Judgment, filed by Plaintiff TRAVCO Insurance Company ("Plaintiff") on March 18, 2010. This case involves a dispute over an insurance policy. Defendant Larry Ward ("Defendant") owns a residence that is insured under a homeowners insurance policy issued by Plaintiff. (Compl. ¶¶ 1, 8–9.) Defendant's residence contains walls that were constructed using sheets of drywall manufac-

tured in China. (Compl. ¶ 10.) On September 23, 2009, Defendant reported an insurance claim to Plaintiff seeking coverage for damages allegedly caused by this Chinese drywall. (Compl. ¶ 26.) On January 7, 2010, Plaintiff denied Defendant's claim and filed a declaratory judgment action in this Court. (Compl. ¶ 32; *see also* Compl. Ex. C.) Plaintiff seeks a declaration that it is not liable for the damage caused by the Chinese drywall. (Compl. ¶ 15.)

The home insurance policy in question, homeowner's policy # 9812814746331 ("the Policy"), provides coverage for "direct physical loss to property described in Coverages A and B." (Compl. Ex. A at 8.).[1] Coverage A consists of the "dwelling on the 'residence premises,'" and Coverage B consists of other structures on the premises. (*Id.* at 2–3.) This coverage is subject to a number of exclusions, including exclusions for latent defects, faulty materials, corrosion, and pollution. (*Id.* at 8–12.) The Policy contains an ensuing loss provision, however, which restores coverage for ensuing losses not otherwise excluded by the Policy. The Policy also provides coverage for personal property in Coverage C, but this coverage is limited to "direct physical loss" caused by an enumerated list of causes. (*Id.* at 9–10.)

Based on a review of applicable Virginia law,[2] the Court finds that the Ward Residence and its components suffered a "direct physical loss" within the meaning of the Policy. The Court also finds, however, that four separate exclusions apply to the damage claimed. Specifically, the claimed losses are excluded by the Policy's latent defect, faulty materials, corrosion, and pol-

lutant exclusions. Moreover, none of the losses now claimed by Defendant qualify for coverage under the Policy's ensuing loss provisions. The Court will not categorically rule out, however, the possibility that other as-yet-unclaimed losses might be subject to coverage under the Policy's ensuing loss provisions. Accordingly, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART, DENIED IN PART.** The Court hereby enters a declaratory judgment providing as follows:

1. The Policy does not provide coverage for the cost of removing and/or replacing the Drywall in the Ward Residence;

2. The Policy does not provide coverage for the damage claimed by Mr. Ward to the air conditioning equipment at the Ward Residence, which resulted from corrosion;

3. The Policy does not provide coverage for the damage claimed by Mr. Ward to the garage door at the Ward Residence, which resulted from corrosion;

4. The Policy does not provide coverage for the damage claimed by Mr. Ward to the flat screen televisions; and

5. The Policy does not provide coverage for any presently claimed damages caused by the Drywall in the Ward Residence or for any presently claimed damage caused by the discharge of gas from the Drywall, including but not limited to any damage to wiring and copper components of the home.

---

1. When referring to page numbers in the Policy, the Court refers to the page numbers contained in the original document, rather than the pagination of the document in CM/ECF.

2. Virginia law must be utilized to determine the question of coverage in this Policy written in Virginia for a homeowner of a Virginia home. *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.,* 377 F.3d 408, 419 (4th Cir.2004) (citing *Buchanan v. Doe,* 246 Va. 67, 431 S.E.2d 289, 291 (1993)).

## I. FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Policy

Defendant owns a residence located at 214 80th St. in Virginia Beach ("the Ward Residence"). (Compl. ¶ 8; Ans. ¶ 8.) Defendant purchased this residence on May 1, 2007. (*Id.*) On May 7, 2007, Defendant took out a homeowner's insurance policy, Policy No. 981281476331, issued by Plaintiff. (Comp. ¶ 9; Ans. ¶ 9.) The Policy initially covered the Ward Residence from May 7, 2007 to May 7, 2008; Defendant renewed the policy twice for coverage from May 7, 2008 to May 7, 2010. (*Id.*)

The Policy is divided into two Sections. Section I provides property coverage, and Section II provides liability coverage. (Compl. Ex. A.) Section I is further subdivided into four separate Coverage sections. Coverage A provides coverage for the dwelling, Coverage B provides coverage for other structures, Coverage C provides coverage for personal property, and Coverage D provides coverage for loss of use.

The core of the Policy is in Section I— Perils Insured Against, which provides as follows:

1. We insure against risk of direct physical loss to property described in Coverages A and B.

2. We do not insure, however, for loss:

a. Excluded under Section 1—Exclusions; or

b. Caused by:

. . .

(6) Any of the following:

. . .

(b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

(c) Smog, rust or other corrosion, mold, fungi, wet or dry rot;

. . .

(e) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed

. . . .

Under 2.b. above, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered.

(Compl. Ex. A at 8–9.) The Policy does not define "direct physical loss." However, it does define "Property Damage" as "physical injury to, destruction of, or loss of use of tangible property." (*Id.* at 2.)

Section I—Exclusions sets forth twelve different categories of exclusions. In relevant part, it provides as follows:

B. We do not insure for loss caused by any of the following. However, any ensuing loss which is not excluded by any other provision in this policy is covered.

. . .

3. Faulty, inadequate or defective:

. . .

b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. Materials used in repair, construction, renovation or remodeling;

. . .

of part or all of the property whether on or off the "residence premises."

(*Id.* at 10–12.)

Coverage C provides for coverage against "direct physical loss to the property described in Coverage C caused by any

of the following perils, unless the loss is excluded in Section I—Exclusions." (*Id.* at 9–10.) The Policy then lists seventeen specific perils such as fire and theft. None of these perils is relevant to the present case. (*Id.*)

Coverage D provides for the payment of additional living expenses. Specifically, it provides that "[i]f a loss covered under Section I makes that part of the 'residence premises' where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living." (*Id.* at 4.)

### 2. The Insurance Claim

The Ward Residence contains walls that were constructed using sheets of Chinese drywall ("the Chinese Drywall"). (Compl. ¶ 10; Ans. ¶ 10.) Over time, the Chinese Drywall in the Ward Residence has released sulfuric gas into the Residence. (*See generally* Hejzlar Dec.) On August 10, 2009, Defendant filed a lawsuit in the Circuit Court for the City of Norfolk against several development and supply companies, alleging that they constructed his home with "inherently defective" drywall. (Mumford Aff. Ex. A.) The suit is captioned *Ward v. Peak Building Corp.* In relevant part, Defendant alleges that the Chinese Drywall in his home "emits various sulfide gasses and/or other toxic chemicals through 'off-gassing' that create noxious odors and cause damage and corrosion." *Ward v. Peak Building Corp.*, No. CL09–5167, Compl. 11 (Va. Cir. Ct. filed Aug. 10, 2009). Defendant further claims that the "compounds emitted by the drywall at issue are also capable of ... harming the health of individuals." *Id.* 12. The case is currently part of a

multi-district litigation pending in the Eastern District of Louisiana. *See In re Chinese–Manufactured Drywall Prods. Liability Litig.*, MDL No.2047, 626 F.Supp.2d 1346 (J.P.M.L.2009).

While this state court lawsuit was pending, Defendant began to prepare an insurance claim. Defendant retained Dr. Zdenek Hejzlar, an occupational safety and health engineer, to inspect his home. On August 26, 2009, Dr. Hejzlar personally inspected the Ward Residence. (Compl. ¶¶ 13–14; Ans. ¶¶ 13–14.) Additionally, Dr. Hejzlar instructed an investigator to perform a second inspection of the Ward Residence on August 31, 2009. (Compl. ¶ 18; Ans. ¶ 18.) Dr. Hejzlar found, *inter alia*, that the level of sulfur gas inside the Ward Residence was twenty times higher than ambient levels; that there was "widespread impact to susceptible metal surfaces (e.g. copper, silver, chrome) such as HVAC coils, electrical wiring in outlets, ground wires and other metallic surfaces"; and that the residents of the home should be relocated to assure their safety. (Hejzlar Dec.)

On September 23, 2009, Defendant filed a claim with Plaintiff, seeking coverage for damages related to the Chinese Drywall. (Compl. ¶ 26; Ans. ¶ 26.) On January 7, 2010, Plaintiff sent Defendant a letter denying coverage for his claim. (Compl. Ex. C.) Plaintiff also informed Defendant that it would be filing suit in this court "seeking a declaratory judgment that your policy does not provide coverage for your claim." (*Id.*)

### 3. Present Suit

On January 7, 2010, Plaintiff filed a declaratory judgment action in this Court pursuant to 28 U.S.C. § 2201.[3] Plaintiff

---

**3.** Section 2201 provides as follows: "In a case of actual controversy within its jurisdiction, except [in certain enumerated cases], any court of the United States, upon the filing

of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

seeks a declaration "that, under the Policies, it has no obligation to provide coverage for the losses claimed by Mr. Ward." (Compl. ¶ 74.) More specifically, Plaintiff requests that the Court grant the following relief:

A. Enter a declaratory judgment that the Policy does not provide coverage for the cost of removing and/or replacing the Drywall in the Ward Residence;

B. Enter a declaratory judgment that the Policy does not provide coverage for the damage claimed by Mr. Ward to the air conditioning equipment at the Ward Residence;

C. Enter a declaratory judgment that the Policy does not provide coverage for the damage claimed by Mr. Ward to the garage door at the Ward Residence;

D. Enter a declaratory judgment that the Policy does not provide coverage for the damage claimed by Mr. Ward to the flat screen televisions;

E. Enter a declaratory judgment that the Policy does not provide coverage for any damage caused by the Drywall in the Ward Residence or for any damage caused by the discharge of gas from the Drywall, including but not limited to any damage to wiring and copper components of the home; and

F. Grant such other relief as this Court deems just and appropriate.

(Compl. at 15.)

Plaintiff's argument proceeds by dividing Defendant's insurance claim into three categories: a claim for the cost of removal and replacement of the Chinese Drywall; a claim for damage to Plaintiff's air conditioning equipment and garage door; and a claim for damage to Plaintiff's flat screen televisions. Plaintiff then argues that it is not liable for any of these three claims.

With regard to the claim for the cost of removing the Chinese Drywall, Plaintiff argues that "the Drywall has not sustained a 'direct physical loss,' and therefore does not fall within the grant of coverage in the Policy." (Id. ¶ 56.) Plaintiff further argues that even if there had been a direct physical loss to the Drywall, this loss would be excluded from coverage under either the latent defect or faulty material exclusions quoted above. (Id. ¶¶ 57–58.) For similar reasons, Plaintiff argues that the presence of gas and odor in the does not constitute a "direct physical loss," and would be subject to exclusion under the latent defect or faulty materials exclusions in any event. (Id. ¶¶ 59–61.) Additionally, Plaintiff argues that any direct physical loss caused by gas and odor would be subject to the pollutant exclusion.

Plaintiff concedes that the damage caused to the air conditioning equipment and garage door in the Ward Residence does constitute a direct physical loss. Plaintiff argues, however, that this loss is subject to the latent defect exclusion, the faulty material exclusion, the pollutant exclusion, and the corrosion exclusion. (Id. ¶¶ 63–65.)

Turning to the flat screen televisions, Plaintiff argues that the televisions are personal property covered under Coverage C of the Policy. Coverage C only provides coverage for certain enumerated perils. Plaintiff argues that none of the enumerated perils applies in this case. (Id. ¶¶ 67–68.) Plaintiff further argues that any damage to the televisions is excluded by the faulty material exclusion described above. (Id. ¶ 69.)

Defendant filed an Answer on March 4, 2010. On March 8, 2010, Defendant filed a Motion to Transfer Venue, seeking to

Any such declaration shall have the force and effect of a final judgment or decree and shall

be reviewable as such."

transfer this action to the United States District Court for the Eastern District of Louisiana. The Court denied this Motion on March 30, 2010.

## II. MOTION FOR SUMMARY JUDGMENT

On March 18, 2010, Plaintiff filed a Motion for Summary Judgment. In this Motion, Plaintiff repeats the arguments presented in the Complaint. To reiterate these arguments briefly, Plaintiff argues as follows:

> The Policy does not provide coverage for these losses for several reasons. First, any claim for the cost of removing and/or replacing the drywall is not covered because the drywall itself has not sustained a direct physical loss. Second, any damage caused by the drywall and/or the gases emitted from the drywall, including the claimed damage to metallic surfaces, is excluded as loss caused by a latent defect, faulty materials, and pollutants (gaseous contaminants.) Third, any damage to metallic surfaces in Mr. Ward's home is also independently excluded because loss caused by corrosion is excluded.

(Pl.'s Mem. of Law in Supp. of its Mot. for Sum. J. 11 [hereinafter Pl.'s Br.].)

Defendant filed a Memorandum in Opposition on April 19, 2010. Defendant argues that he "has easily met his light burden of establishing coverage because his 'dwelling,' has been physically damaged, such damage being an undisputed fact." (Def.'s Resp. in Opp. to Pl.'s Mot. for Sum. J. 8 [hereinafter Def.'s Br.].) Defendant points to the definition of "Physical Damage" in the policy, which includes "loss of use of tangible property." (*Id.*) Defendant further notes that while the Drywall in his home "is still functioning as

it was intended, it is nevertheless causing harm to other components of the home...." (*Id.* at 8–9.) Finally, Defendant argues that even if the Drywall itself has not sustained a direct physical loss, Plaintiff is still liable for the cost of remediation because removal of the Drywall is necessary to fix damaged wiring and plumbing. (*Id.* at 9.)

Defendant argues that none of the exclusions in the Policy applies. With regard to the latent defect exclusion, Defendant argues that "the intent of the exclusion is to preclude inevitable damage to the product itself from, for example internal decomposition." (*Id.* at 12–16.) Turning to the faulty materials exclusion, Defendant argues that this exclusion does not apply because the Drywall "is serving its intended purpose." (*Id.* at 22–23.) As for the corrosion exclusion, Defendant argues that it is inapplicable because corrosion was not the proximate cause of the damage, but rather its effect. (*Id.* at 23–25.) Finally, Defendant maintains that the pollution exclusion is inapplicable because this exclusion applies only to environmental damage, not to damage from substandard building materials. (*Id.* at 25–30.) Additionally, Defendant argues that even if one of these four exclusions apply, Plaintiff is still liable under the "ensuing loss" provisions in the Policy. (*Id.* at 17–21.) Defendant further contends that the ensuing loss provision provides coverage for the damage to his personal property. (*Id.* at 31.)

Plaintiff filed a rebuttal brief on April 26, 2010.[4] The Court held a hearing on May 18, 2010, and heard argument from the parties.

## III. LEGAL STANDARD

Although Virginia law governs the substantive aspects of this case, the proce-

---

4. The Court commends the parties on their excellent briefing of the complex issues in this case.

dural aspects of summary judgment are determined by federal law. *Hatfield v. Occidental Chem. Corp.*, 842 F.2d 1290 (4th Cir.1988) (unpublished); *see also Caesar Elecs. Inc. v. Andrews*, 905 F.2d 287, 289 n. 3 (9th Cir.1990). Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Factual disputes which do not raise a *"genuine* issue of *material* fact" are insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002), while also abiding by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir.2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

█ This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201. Virginia law must be utilized to determine the question of coverage in this Policy written in Virginia for a homeowner of a Virginia home. *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir.2004) (citing *Buchanan v. Doe*, 246 Va. 67, 431 S.E.2d 289, 291 (1993)). "When state law provides the rule for decision in a suit for declaratory judgment in

federal court, whether or not the burden of proof should be shifted is determined according to the rule in the forum state for similar declaratory actions." *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 273 (4th Cir.1980). Under Virginia law, "[i]n an action for declaratory judgment, the burden of proof is not put on the plaintiff merely because he has filed the action. Rather, the Court must examine the underlying issues to determine who bears the burden of proof." *Rainwater Concrete Co. v. Cardinal Concrete Co.*, 17 Va. Cir. 325 (Va.Cir.Ct.1989) (citing *Reasor v. City of Norfolk*, 606 F.Supp. 788, 793 (E.D.Va. 1984)).

█ In an insurance contract dispute, Virginia courts place the burden on the policyholder "to bring himself within the policy." *Maryland Cas. Co. v. Cole*, 158 S.E. 873, 876, 156 Va. 707 (1931). After the policyholder establishes a *prima facie* case, the "burden shift[s] to the defendant insurance company to prove its affirmative defense." *RML Corp. v. Assurance Co. of America*, 60 Va. Cir. 269 (Va.Cir.Ct.2002). Policy exclusions are an affirmative defense; accordingly, "the burden is upon the insurer to prove that an exclusion applies." *Allstate Ins. Co. v. Gauthier*, 273 Va. 416, 641 S.E.2d 101, 104 (2007) (quoting *Transcontinental Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 512, 551 S.E.2d 313 (2001)).

█ Virginia courts "interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words that have been used in the documents." *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 427 S.E.2d 193, 196 (1993). When the language of the "policy is clear and unambiguous, courts do not employ rules of construction, rather, they give the language its plain and ordinary meaning and enforce the policy as written." *Partnership Umbrella, Inc. v.*

*Fed. Ins. Co.*, 260 Va. 123, 530 S.E.2d 154, 160 (2000). If, on the other hand, the contract is found to be lacking in clarity, the "court should resort to parol evidence to ascertain the true intention of the parties." *Aetna Cas. & Sur. Co. v. The Fireguard Corp.*, 249 Va. 209, 455 S.E.2d 229, 232 (1995). Exclusionary language "will be construed most strongly against the insurer." *Allstate*, 641 S.E.2d at 104.

Insurance contracts are merely another type of contract, and the court must construe a policy's terms to mean what they say. *See Pilot Life Ins. Co. v. Crosswhite*, 206 Va. 558, 145 S.E.2d 143, 146 (1965) (stating that "it is the function of the court to construe the language of the contract as written"). Although the equities often favor the insured, a court must give meaning to the written language of the policy. Law and economics tell us that the person who can best bear the loss is the group, because the group is merely the group of persons who are insured. But if many people go to the trough at the same time, the trough soon empties. *See generally* James M. Fischer, *Why Are Insurance Contracts Subject to Special Rules of Interpretation?: Text Versus Context*, 24 Ariz. St. L.J. 995, 1060–66 (1992) ("Although insureds may present sympathetic cases for loss transference, public policy does not mandate a system for compensating insureds.").

## IV. ANALYSIS

As discussed above, the initial burden rests upon Defendant to "bring himself within the policy." *Maryland Cas. Co.*, 158 S.E. at 876. Plaintiff concedes that the damage to Defendant's garage door and air conditioning unit falls within the Policy, but argues that neither the cost of removing and replacing the Chinese Drywall itself nor the damage to Defendant's televisions is covered. (*See* Pl.'s Br. at 11–14; 26). Part IV.1 addresses the question of whether the Chinese Drywall falls within the policy. For the reasons stated below, the Court finds that the Ward Residence has suffered a "direct physical loss" and that the cost of removing and replacing the Chinese Drywall does fall within the policy. The separate question of whether the damage to Defendant's televisions is covered is addressed separately in Part IV.6 of this Opinion.

Demonstrating that the claimed damage falls within the Policy is only the first step. Should Defendant successfully carry his burden, the burden shifts to Plaintiff to demonstrate that one of the exclusions in the Policy applies. As noted above, Plaintiff argues that the latent defect, faulty materials, corrosion, and pollution exclusions all apply. (*See* Pl.'s Br. at 14–25.) The Court addresses each of these exclusions separately in Part IV.2, Part IV.3, Part IV.4, and Part IV.5, respectively. For the reasons stated therein, the Court finds that at least one of the four exclusions applies to each of the claimed losses to the Ward Residence and its components.

Because the exclusions apply, Defendant can only recover if the claimed loss is an "ensuing loss to property described in Coverages A and B not excluded by any other provision in" the Policy. (Compl. Ex. A at 8.) The Court addresses this ensuing loss provision in Part IV.6 of this Opinion. For the reasons set forth therein, the Court finds that the ensuing loss provision does not apply to any of the claimed losses presently before the Court. The Court does not categorically rule out the possibility, however, that other unclaimed losses might be subject to coverage.

### 1. Direct Physical Loss

Defendant seeks to recover for the cost of removing and replacing the Chinese Drywall. To bring this claim within the

Policy, Defendant must demonstrate that a "direct physical loss" has occurred. (*See* Compl. Ex. A at 8.) The parties disagree as to whether the Ward Residence has suffered a "direct physical loss." The Policy does not define the term "direct physical loss," although it defines "Property Damage" as "physical injury to, destruction of, or loss of use of tangible physical property." (*Id.* at 2.) Plaintiff argues that there has been no direct physical loss because the Drywall is "physically intact, functional and has no visible damage." (Pl.'s Br. at 11.) In response, Defendant points to the definition of "Property Damage" in the Policy. (Def.'s Br. at 8.) He argues that there has been "Property Damage," and thus direct physical loss, because he has been forced to leave his residence. (Def.'s Br. at 8.) Defendant further argues that loss of use is sufficient to constitute direct physical loss under Virginia law, citing *U.S. Airways v. Commonwealth Ins. Co.*, 64 Va. Cir. 408, 2004 WL 1094684 (Va.Cir.Ct.2004). (*Id.* at 8–9.) Finally, Defendant argues that even if there has been no direct physical loss to the Drywall, Plaintiff is still liable to pay for the costs of reasonable repair. (*Id.* at 11.)

The Court finds that the Ward Residence has suffered a direct physical loss, based on a review of relevant precedent. The only Virginia case on the subject is *U.S. Airways v. Commonwealth Ins. Co.*, 64 Va. Cir. 408 (Va.Cir.Ct.2004). In *U.S. Airways*, the plaintiff's insurance policy insured "against all risk of direct physical loss of or damage to property described herein." After the September 11th attacks, the federal government shut down Reagan National Airport for nearly a month. U.S. Airways filed a claim, but its insurer denied coverage because there was no physical damage to U.S. Airways' property. The court rejected this argument, ruling that "[d]amage to the physical property of U.S. Airways is not a condition

precedent to recovery for business interruption." *Id.* at *5.

At first glance, *U.S. Airways* appears to strongly support Defendant's position. As Plaintiff points out, however, *U.S. Airways* can be read in two different ways. (*See* Pl.'s Reb. Br. in Further Supp. of Its Mot. for Summ. J. 4 [hereinafter Pl.'s Reb. Br.].) Broadly interpreted, *U.S. Airways* stands for the proposition that actual physical damage is not necessary to trigger coverage "against all risk of direct physical loss of or damage to property." But the case can also be read more narrowly for the proposition that damage to property specifically owned by the insured—as opposed to property owned by a third party—is not necessary. *See U.S. Airways*, 64 Va. Cir. at *4 ("Rather, the Policy only uses the terms 'direct' and 'property' without any definitions or references to what property must be damaged or where the loss must have occurred prior to civil authority intervention."). Under this latter interpretation, damage to property is still a necessary predicate to insurance coverage, although the property in question need not be owned by the insured.

Since *U.S. Airways* does not provide a clear answer to the question presented, the Court must look to precedent from other jurisdictions. The majority of cases appear to support Defendant's position that physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces. For example, in *Hughes v. Potomac Insurance Co.*, 199 Cal.App.2d 239, 18 Cal.Rptr. 650 (1962), the land around the insured's home fell away in a landslide, leaving the home perched on a cliff. The court held that this constituted a physical loss to the dwelling, stating as follows:

> To accept appellant's interpretation of its policy would be to conclude that a building which has been overturned or

which has been placed in such a position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.

*Id.* at 248–249, 18 Cal.Rptr. 650; *see also Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir.2009) (applying Massachusetts law and finding that unpleasant odor was physical injury to property); *Motorists Mutual Ins. Co. v. Hardinger*, 131 Fed.Appx. 823, 825–27 (3d Cir.2005) (applying Pennsylvania law and finding that bacteria contamination of well water would constitute direct physical loss to house if it rendered it unusable); *Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 437 P.2d 52, 55 (1968) (*en banc*) (gasoline fumes which rendered church building unusable constitute physical loss); *Farmers Ins. Co. of Oregon v. Trutanich*, 123 Or.App. 6, 858 P.2d 1332, 1336 (1993) (cost of removing odor from methamphetamine lab constituted a direct physical loss); *Murray v. State Farm Fire & Cas. Co.*, 203 W.Va. 477, 509 S.E.2d 1, 17 (1998) (home rendered unusable by increased risk of rockslide suffered direct physical loss even in the absence of structural damage).

In support of its argument that physical damage requires some physical alteration or injury to the property's structure, Plaintiff cites a number of cases from other jurisdictions. The cases Plaintiff cites are all readily distinguishable, however, in that they do not involve situations in which the property in question was rendered unusable. *See Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226,

236 (3d Cir.2002) ("The structure continues to function-it has not lost its utility."); *Whitaker v. Nationwide Mut. Fire Ins. Co.*, 115 F.Supp.2d 612, 614 (E.D.Va.1999) (insured was "dissatisfied with the quality and workmanship of" construction); *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F.Supp. 259, 263 (D.Or.1990) (insured filed claim for loss of assessment value and loss of a tenant). In the present case, by contrast, Defendant's home has been rendered uninhabitable by the toxic gases released by the Chinese Drywall. This is a critical distinction. *See Port Authority*, 311 F.3d at 236 (" '[P]hysical loss or damage' occurs only if an actual release of asbestos fibers . . . has resulted in contamination of the property . . ., *or the structure is made useless or uninhabitable* . . . ." (emphasis added)).

Plaintiff also tries to buttress its argument by noting that the Policy provides for payment of "Additional Living Expense" in the event that "loss covered under Section I of the Policy makes that part of the 'residence premises' where you reside not fit to live in. . . ." Plaintiff argues that under Defendant's interpretation, a loss of use would always qualify as a "loss covered under Section I," and the words "loss covered under Section I" would therefore become meaningless. This is not true. Even if a total loss of use does constitute a *per se* "direct physical loss," the loss might still be subject to an exclusion, and thus not "covered under Section I."

The Court's conclusion that Defendant has suffered a direct physical loss is strengthened by the fact that the Policy specifically defines "Property Damage" to include "loss of use of tangible property." When read in the context of the precedent discussed above, this definition suggests that the parties intended to define "direct physical loss" to include total loss of use. If Plaintiff intended to define covered losses more narrowly, it should have done so

more clearly. "Having failed to do so, [Plaintiff] cannot now rewrite a policy it issued in hopes of avoiding the terms of an instrument it drafted." *Greenbaum v. Travelers Ins. Co.*, 705 F.Supp. 1138, 1142 (E.D.Va.1989) (mem.).

In light of the precedent discussed above, the Court finds that Defendant has carried his burden to "bring himself within the policy." *Maryland Cas. Co.*, 158 S.E. at 876. Accordingly, the Court must now determine whether one of the exclusions set forth in the Policy applies.

### 2. Latent Defect

In Section 1—Perils Insured Against, the Policy provides as follows:

2. We do not insure, however, for loss:

a. Excluded under Section 1–Exclusions; or

b. Caused by:

. . .

(6) Any of the following:

. . .

(b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

. . .

Under 2.b. above, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered.

(Compl. Ex. A at 8.)

█ Plaintiff argues that this latent defect exclusion applies in the present case. Plaintiff urges the Court to interpret latent defect as a defect that "is not visible or readily discoverable, and did not mani-

fest itself until some time after installation." (Pl.'s Br. at 16.) Applying this definition, Plaintiff claims that the property damage in this case was caused by a latent defect, namely, defects in the chemical composition of the Chinese Drywall. (*Id.*) Plaintiff further notes that Defendant himself described the Chinese Drywall as a "latent Defect" in his state court lawsuit, *Ward v. Peak Building Corp.* (*Id.* at 16–17.)

In response, Defendant argues that the phrase "latent defect" in the Policy is qualified by the modifier "that causes it to damage or destroy itself." (Def.'s Br. at 13–14.) Defendant asserts that the intent of the latent defect exclusion is to "remove the risk transfer of 'expected losses,' such as the gradual deterioration of a product because it has a certain shelf life." (*Id.* at 12.) By this standard, the Chinese Drywall in the Ward Residence does not have a latent defect because it is not deteriorating or damaging itself. In essence, the Defendant contends that the Drywall is defective but not a "latent defect."

At the hearing, the parties appeared to conflate the latent defect and faulty material exception. In point of fact, "latent defect" is a term of art that has a specialized meaning different from "faulty material." In their briefing, the parties apparently agree that, at a minimum, a latent defect must be "integral to the damaged property by reason of *its* design or manufacture or construction." *U.S. West v. Aetna Cas. & Sur. Co.*, 117 F.3d 1415 (4th Cir. July 16, 1997) (unpub. table op.) (emphasis in original). This restriction is intrinsic to the very definition of "latent defect."[5]

---

5. To the extent that Defendant argues that the Policy's exclusion for latent defect is further limited by the words "that causes it to damage or destroy itself," the Court finds this argument to be unpersuasive. Defendant's proposed construction conflicts with the ordinary meaning of the policy language. The

Policy excludes damage caused by "Mechanical breakdown, latent defect, inherent vice, *or any* quality in property that causes it to damage or destroy itself." (Compl. Ex. A at 8) (Emphasis added.) The natural reading of this phrase is that it sets forth four distinct causes: mechanical breakdowns, latent de-

The Fourth Circuit addressed this limitation at length in *U.S. West v. Aetna Casualty & Surety Co.*, 117 F.3d 1415 (4th Cir. July 16, 1997) (unpub. table op.). In *U.S. West*, the insured owned plastic battery jars which had been lubricated with a gel. The gel had a corrosive effect on the battery jars, and caused them to split open and leak. The Fourth Circuit held that the damage to the battery jars was not caused by a latent defect:

> The corrosive effect of the Aqua Gel II surely resulted in a "defect" in and damage to the batteries, but it was not a defect integral to (latent in) their design, manufacture or construction. Though, by definition, every "latent defect" in insured property is likely to be "not readily discoverable," the converse of that proposition does not follow. Not every defect that is not readily discoverable is a "latent" one; only those not readily discoverable that also are integral to the damaged property's design or manufacture or construction fit that description. The defect here does not fit it.

117 F.3d 1415 (citation omitted).

In light of *U.S. West*, it is clear that the damage to Defendant's air conditioner and the damage to his garage door were not caused by a latent defect. The Chinese Drywall in the Ward Residence, like the lubricating gel in *U.S. West*, is not integral to the damaged air conditioner or garage door. To the contrary, there is no indication that the air conditioner or the garage door were manufactured or constructed in a defective manner.

Defendant's claim for the cost of removing and replacing the Chinese Drywall presents a more difficult question. In a certain sense, the Drywall is not "damaged property" at all, and thus its defects cannot be latent defects within the meaning of *U.S. West*. But Defendant cannot argue that he has suffered a "direct physical loss" within the meaning of the Policy, and then turn around and claim that the relevant property remains in an undamaged state. As discussed above, Defendant's claim is for the damages to the Ward Residence. There is no question that the Ward Residence suffers from defects "that . . . are integral to the damaged property's design or manufacture or construction." *U.S. West*, 117 F.3d 1415. Specifically, the Ward Residence contains defective Drywall that is off-gassing and damaging other components of the Residence. The Drywall is plainly integral to the Residence's manufacture and construction. Accordingly, the Court finds that the damage to the Ward Residence is a loss caused by a latent defect.

Defendant's arguments to the contrary are without merit. Defendant argues that the application of the latent defect exclusion to Chinese Drywall cases is inconsistent with the purpose of the exclusion, which is "to remove the risk transfer of 'expected losses,' such as the gradual deterioration of a product because it has a certain shelf life." (Def.'s Br. at 12.) In fact, the purpose of the exclusion is precisely the opposite. The latent defect exclusion is intended to remove the risk for losses that result from flaws in property

---

fects, inherent vices, and other qualities in property. Only the last cause is modified by the words "that causes it to damage or destroy itself." Where the phrase "A, B, or C" is used, C is an alternate, as are A as well as B. The Defendant in essence wants to change the word "or" to "and." Of course, this alternative phrasing would render "latent de-

fect" mere surplusage—another factor that leads the Court to reject Defendant's proposed construction. *See Great Am. Ins. Co. v. Cassell*, 15 Va. Cir. 214, 1988 WL 626029, at *3 (1988) (language in insurance contract "should not be lightly cast aside nor interpreted as unintended surplusage").

that are undetectable, and hence unexpected. *See Glens Falls Ins. Co. v. Long,* 195 Va. 117, 77 S.E.2d 457, 459 (1953) (defining latent defect as "defect which reasonably careful inspection will not reveal" (quotation omitted)).[6] Losses from defective Chinese Drywall fit squarely within this category.

Defendant cites *Finger v. Audubon Ins. Co.,* No. 09–8071, 2010 WL 1222273 (La. Civ.Dist.Ct. Mar. 22, 2010) in support of his argument that the latent defect exclusion is inapplicable to losses from Chinese Drywall. Although *Finger* did indeed reject a latent defect exclusion under strikingly similar facts, the Court finds it to be unpersuasive. As discussed above, there is an inherent contradiction in arguing that property has suffered a "direct physical loss" while simultaneously maintaining that the property is not damaged. Under Fourth Circuit precedent, it is sufficient that the defect be "integral" to the damaged property; it is not necessary to show that the defect is coextensive with the damaged property. *See U.S. West,* 117 F.3d 1415. Moreover, another Louisiana district court has ruled contrary to *Finger* and granted summary judgment to an insurer on facts similar to the case at hand. *See Ross v. C. Adams Const. & Design, L.L. C.,* No. 676–185, 2010 WL 2916525 (La. 24th. Jud.Dist.Ct. Apr. 14, 2010).

For the foregoing reasons, the Court finds that the cost of removing and replacing the Chinese Drywall is excluded by the Policy's latent defect exclusion.

### 3. Faulty Materials

Section I—Exclusions provides as follows:

B.  We do not insure for loss caused by any of the following. However, any ensuing loss which is not excluded by any other provision in this policy is covered.

. . .

3.  Faulty, inadequate or defective:

. . .

b.  Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c.  Materials used in repair, construction, renovation or remodeling;

. . .

of part or all of the property whether on or off the "residence premises."

(Compl. Ex. A at 8.)

Plaintiff argues that this "exclusion for loss caused by faulty or defective materials clearly applies to preclude coverage of all damage resulting from the defect in the drywall." (Pl.'s Br. at 18.) In response, Defendant argues that the Chinese Drywall is not subject to the faulty material exception because it "is serving its normal function and purpose and has not caused damage to itself." (Def.'s Br. at 23.) Defendant cites *Finger* in support of this proposition.

The Court is somewhat skeptical of the argument that the Drywall is "serving its

---

6.  To be sure, latent defect exclusions are historically related to wear and tear exclusions, which do exclude coverage for inevitable and predictable loss over time. Under the "objective theory" of fortuity, property insurance is "thought to be something that happened to the property from an external cause, not something inherent or latent in the property; damage from such an inherent cause was considered, like wear and tear, a certainty and, hence, uninsurable." *Chadwick v. Fire Ins. Exchange,* 17 Cal.App.4th 1112, 21 Cal. Rptr.2d 871, 875 (1993). Despite this historical background, however, the latent defect exclusion is consistently applied to losses that go well beyond expected deterioration in physical property. *See, e.g., Bd. of Educ. of Maine Tp. High School Dist. 207 v. Int'l Ins. Co.,* 292 Ill.App.3d 14, 225 Ill.Dec. 987, 684 N.E.2d 978 (1997) (applying latent defect exclusion to asbestos contamination).

intended purpose." Although the Drywall has not collapsed or otherwise physically deteriorated, it is certainly not serving its purpose as a component of a livable residence. In any event, Defendant's argument—that an item cannot be faulty or defective if it is "serving its intended purpose"—is contrary to ordinary English usage. In common parlance, the word "faulty" is not limited to faults that prevent an entity from accomplishing its intended purpose and itself. *See* Oxford English Dictionary (2d Ed. 1989) (defining "faulty" as "[c]ontaining faults, blemishes or defects; defective, imperfect, unsound"). The same principle applies to the word "defective." [7]

Consistent with the ordinary meaning of the words "faulty" and "defective," courts have held that the faulty materials exclusion can apply even when the property in question may be serving its intended purpose. *See Yale Univ. v. Cigna Ins. Co.,* 224 F.Supp.2d 402 (D.Conn.2002) (otherwise functional building materials containing lead and asbestos subject to faulty materials exclusion); *Falcon Prods., Inc. v. Ins. Co. of Pa.,* 615 F.Supp. 37, 39 (E.D.Mo.1985) (scrap metal containing radioactive pellets was "faulty material"); *Wurtele v. Cincinnati Ins. Co.,* No. 8:07cv340, 2009 WL 205057 (D. Neb. Jan. 27, 2009) (street pavement which expanded, damaging insured's property, was "faulty workmanship"); *Arkin v. Fireman's Fund Ins. Co.,* 228 Ga.App. 564, 492 S.E.2d 314, 317 (1997) (negligent installation of driveway, which led to damage over time to underlying culverts, subject to faulty workmanship exception); *Hartford Cas. Ins. Co. v. Evansville Vanderburgh Public Lib.,* 860 N.E.2d 636, 647 (Ind.Ct. App.2007) (use of high-frequency pile driv-

er, which caused soil "densification" which in turn led to building collapse, qualified as "faulty workmanship"). The only authority to the contrary appears to be *Finger.* Again, the Court declines to follow *Finger.* In rejecting the insurer's faulty material exclusion, the *Finger* court cited no authority in support of its holding. The clear weight of authority stands against *Finger* and supports the application of the faulty material exclusion.

The Court notes that Defendant himself repeatedly describes the Drywall as "defective" in his state court suit. For example, Defendant states that "[t]he drywall, used in [the Ward Residence] is inherently defective because it emits various sulfide gases and/or other toxic chemicals through 'off-gassing' that create noxious odors and cause damage and corrosion...." *Ward v. Peak Building Corp.,* No. CL09–5167, Compl. 11 (Va. Cir. Ct. filed Aug. 10, 2009). Defendant is certainly not estopped from urging a different definition of "defective" in this present action. *See Nautilus Ins. Co. v. Gardner,* No. Civ.A. 04–1858, 2005 WL 664358, at *6 n. 3 (E.D.Pa. Mar. 21, 2005). But in the absence of some evidence that the parties intended to assign a specialized meaning to the word "defective" in the Policy, the fact that Defendant himself described the Drywall as "defective" certainly weighs in favor of the application of the exclusion.

*4. Corrosion*

Section I—Property Coverages provides as follows:

2.   We do not insure, however, for loss:

a.   Excluded under Section 1—Exclusions; or

b.   Caused by:

---

7.   An argument could be made that the word "inadequate" is limited to shortcomings that prevent an entity from fully achieving its intended purpose. Because the Court finds that

the Chinese Drywall is unambiguously defective and faulty, however, the Court need not parse the meaning of "inadequate."

. . .

(6) Any of the following:

. . .

(c) Smog, *rust or other corrosion,* mold, fungi, wet or dry rot;

(Compl. Ex. A at 8) (emphasis added).

■ Plaintiff argues that "the claimed damage to metals and metallic surfaces (including but not limited to, air conditioning equipment and a garage door) falls within the exclusion for loss caused by 'corrosion.'" (Pl.'s Br. at 20). Plaintiff notes that Defendant referred to corrosion in his state court complaint. Specifically, Defendant stated that the Drywall caused "corrosion . . . to the structural, mechanical and plumbing systems of [Mr. Ward's] home such as the framing, heating, air-conditioning and ventilation ('HVAC') units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and Other Property such as microwaves, utensils, electronic appliances, jewelry, and other household and personal property items." *Ward v. Peak Building Corp.,* No. CL09–5167, Compl. 11 (Va. Cir. Ct. filed Aug. 10, 2009).

For his part, Defendant argues that the corrosion exclusion is not applicable because "the loss . . . is not caused by corrosion (instead corrosion is the loss caused by the gases emitted by the drywall)." (Def.'s Br. at 23.) In support of this assertion, Defendant cites *Finger* and *Pioneer Chlor Alkali Co. v. Nat'l Union,* 863 F.Supp. 1226 (D.Nev.1994). In *Pioneer Chlor,* a rag was stuffed into a pipe, diverting chemicals which corroded holes into the pipe. As a result, chloride gas leaked out and caused environmental damage. The district court ruled that the corrosion exclusion did not apply because a reasonable jury could find that the rag, rather than the corrosion in the pipe, was the cause of the damage. *Id.* at 1231–32.

■ The weight of authority tends to favor Plaintiff's position. As a general rule, "[e]xclusions for damages caused by 'corrosion' precludes [sic] recovery for any damage caused to property because of contact with any corrosive agent. Most jurisdictions hold that an exclusion for damages caused by corrosion precludes recovery for damages caused by corrosion regardless of what caused the corrosion or how suddenly the corrosion occurred." 11 Couch on Ins. § 153:80; *see, e.g., Arkwright–Boston Manufacturers Mutual Insurance Co. v. Wausau Paper Mills Co.,* 818 F.2d 591, 594–95 (7th Cir.1987) (corrosion exclusion applied to equipment damaged by acid spill); *Alex R. Thomas & Co. v. Mutual Service Casualty Ins. Co.,* 98 Cal.App.4th 66, 119 Cal.Rptr.2d 394 (2002) (corrosion exclusion applied to damage from chlorine wearing away coils); *Gilbane Building Co. v. Altman Co.,* No. 04AP–664, 2005 WL 534906 (Oh.Ct.App. Mar. 8, 2005) (corrosion exclusion applied to damage stemming from contractor negligence).

The Court agrees with these precedents for two reasons. First, the ordinary meaning of corrosion includes the "action or process of corroding." Oxford English Dictionary (2d Ed. 1989). As it is undisputed that the damage to the "structural, mechanical and plumbing systems" of the Ward Residence was caused by the "action or process of corroding," the corrosion exclusion unambiguously applies. *See Kay v. United Pac. Ins. Co.,* 902 F.Supp. 656, 658 (D.Md.1995) (applying corrosion exclusion on these grounds). Second, Defendant's position would tend to render the corrosion exception meaningless. As the court stated in *Bettigole v. American Employers Insurance Co.,* 30 Mass.App.Ct. 272, 567 N.E.2d 1259, 1262 (1991), if Defendant's "view were adopted, the corrosion exclusion would tend to disappear altogether because some similar agent of the process could always be identified." *Accord Cen-*

*tral Int'l Co. v. Kemper Ins. Companies,* No. 97–CV–10630, 1999 WL 694048 (D.Mass. Apr. 22, 1999).

Defendant's reliance on *Pioneer Chlor* is misplaced. In *Pioneer Chlor,* the insured did not seek to recover for the corroded material itself. Rather, the insured sought coverage for damage relating to chlorine gas that passed through corroded pipes and contaminated the entire structure. The court expressed no doubt that the "chemical reaction which caused the perforations and the chemical reaction which caused the hole at the elbow were corrosion," and thus excluded from coverage. 863 F.Supp. at 1236. The only question was whether the subsequent release of chlorine gas was also subject to the corrosion exclusion, or whether the misplaced rag was the "efficient proximate cause" of the gas release. As such, *Pioneer Chlor* is of no assistance to Defendant in the present case, where the claim is for damage to the corroded material itself. *See Alex R. Thomas & Co. v. Mutual Service Casualty Ins. Co.,* 98 Cal.App.4th 66, 119 Cal. Rptr.2d 394 (2002) (distinguishing *Pioneer Chlor* on these grounds). Indeed, *Pioneer Chlor* actually supports Plaintiff's argument because the court found the damage to the pipe to be "corrosion."

Based on the foregoing, the Court finds that the claimed losses to the structural, mechanical, and plumbing components of the Ward Residence to be excluded by the corrosion exclusion.

### 5. Pollution

In Section I—Coverages, the Policy provides:

2. We do not insure, however, for loss:
  a. Excluded under Section 1—Exclusions; or
  b. Caused by:

  . . .

  (6) Any of the following

  . . .

  (e) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C.

  Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

(Compl. Ex. A at 8.)

Plaintiff argues that this pollution exclusion bars coverage for Defendant's damages, stating that "the sulfuric gases released by the Chinese drywall in Mr. Ward's residence plainly qualify as" irritants, contaminants, and fumes. (Pl.'s Br. at 23.) Defendant argues that the pollution exclusion is inapplicable because the Chinese Drywall is not a recognized environmental pollutant, and the gases in question were not widely released into the environment. (Def.'s Br. at 25–30.)

Pollution exclusions are a frequently litigated topic, and "there exists not just a split of authority, but an absolute fragmentation of authority." *Porterfield v. Audubon Indem. Co.,* 856 So.2d 789, 800 (Ala. 2002). Roughly speaking, most states fall "into one of two broad camps." *Apana v. TIG Ins. Co.,* 574 F.3d 679, 682 (9th Cir. 2009). The first camp consists of courts that "have concluded that the clause is intended to preclude coverage for environmental pollution, not for 'all contact with substances that can be classified as pollutants.'" *Keggi v. Northbrook Prop. & Cas. Co.,* 199 Ariz. 43, 13 P.3d 785, 790 (2000) (quoting *Stoney Run Co. v. Prudential–LMI Comm. Ins. Co.,* 47 F.3d 34, 38 (2d Cir.1995)). The second camp consists of courts that have refused to read such a distinction into seemingly unambiguous pollutant exclusions. *See, e.g., Bitumi-*

*nous Cas. Corp. v. Sand Livestock Systems, Inc.,* 728 N.W.2d 216, 221 (Iowa 2007) ("But the plain language of the exclusions at issue here makes no distinction between 'traditional environmental pollution' and injuries arising from normal business operations.").

Virginia appears to fall within the latter camp. In *City of Chesapeake v. States Self–Insurers Risk Retention Group, Inc.,* 271 Va. 574, 628 S.E.2d 539 (2006), the Virginia Supreme Court addressed the application of a pollutant exclusion to the release of toxic trihalomethanes ("THMs") into a municipal water supply. The court held that the pollutant exception applied, stating as follows: "By definition, the THMs involved in [*City of Chesapeake v.*] *Cunningham* [268 Va. 624, 604 S.E.2d 420 (2004) ] are 'contaminants.' Therefore, according to the plain language of the insurance policy in the instant case, because they are 'contaminants,' THMs are 'pollutants.'" *Id.* at 541.

Defendant correctly notes that *City of Chesapeake* involved "traditional environmental pollution," in that the "THMs at issue in *City of Chesapeake* were recognized environmental pollutants and the emissions occurred outdoors." Defendant argues that the Virginia Supreme Court "had no reason to address the issue of whether its opinion applied to events occurring within an enclosed area," (Def.'s Br. at 28), and urges this court to instead apply a pre-*City of Chesapeake* precedent, *Unisun Ins. Co. v. Schulwolf,* 53 Va. Cir. 220, 2000 WL 33340659 (2000). In *Unisun,* a Virginia Circuit Court declined to apply a pollutant exception clause to lead paint, stating that "it is reasonable to conclude that the exclusion clause applies only to claims based on environmental pollution." *Id.* at *4.

The Court must decline this invitation to second-guess the Virginia Supreme Court. In two cases decided in the wake of *City of Chesapeake,* courts within this jurisdiction applied pollutant exclusions to the release of household pollutants. In *Firemen's Ins. Co. v. Kline & Son Cement Repair,* 474 F.Supp.2d 779 (E.D.Va.2007), a contractor applied an epoxy sealant to a concrete floor in a warehouse. A warehouse employee was injured by the release of epoxy fumes. The employee filed suit against the contractor, and the contractor sought indemnity for this claim pursuant to a commercial general liability (CGL) policy. The insurer denied coverage based on a pollutant exclusion. Applying Virginia law, the court ruled in favor of the insured. The court specifically rejected the argument now presented by the Defendant, stating as follows:

> The Supreme Court of Virginia did not expressly limit its holding in *City of Chesapeake* to cases involving "traditional" environmental pollution, and there is no reason to believe that it would do so if presented with the facts of the instant case. The Court explicitly refused to look to the holdings of courts in other jurisdictions which had interpreted similar pollution exclusion provisions. Rather, the Court simply applied the facts of the case to the language presented in the policy's pollution exclusion clause, and analyzed the results under well-established Virginia contract law. . . . .[T]he insureds contend that the Pollution Exclusion clause is not applicable because the facts of this case do not evince a traditional pollution scenario. . . . The argument belies Virginia's settled principles of contract interpretation. Nowhere in the Policy is there any reference to the word "environment," "environmental," "industrial," or any other limiting language suggesting the pollution exclusion is not equally applicable to both "traditional" and indoor pollution scenarios.

*Id.* at 796–99 (footnote omitted). Similarly, in *West American Ins. Co. v. Johns*

*Bros., Inc.*, 435 F.Supp.2d 511 (E.D.Va. 2006), a court in this jurisdiction applied a pollutant exclusion to the discharge of residential heating oil.

■ The Court finds *Firemen's Ins. Co.* to be persuasive. Under Virginia law, pollutant exclusions are not limited to "traditional environmental pollution." Although *City of Chesapeake* did happen to involve traditional pollutants, the Virginia Supreme Court stated its holding in a simple syllogism: Because the harm was caused by the release of a pollutant, the pollutant exclusion applied. This is consistent with basic principles of Virginia insurance law, which has long taken the position that "no court can 'insert by construction, for the benefit of a party, a term not express in the contract.'" *Baldwin v. Baldwin*, 44 Va.App. 93, 603 S.E.2d 172, 176 (2004) (quoting *Am. Spirit Ins. Co. v. Owens*, 261 Va. 270, 541 S.E.2d 553, 555 (2001)).

■ To the extent that the parties raise policy considerations for or against *City of Chesapeake*, these arguments are addressed to the wrong forum. The Supreme Court of Virginia creates its own policy, not this Court. "[T]he federal courts in diversity cases, whose function it is to ascertain and apply the law of a State as it exists, should not create or expand that State's public policy." *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir.1995). Defendant's interpretation may be more consistent with the historical development of pollutant exclusions in insurance law. His interpretation may present a well-reasoned method for reigning in potentially broad pollutant exclusion clauses. It may be consistent with

precedent in other jurisdictions, including *Finger*. But unless and until the Virginia Supreme Court accepts these arguments and reverses *City of Chesapeake*, this Court remains bound by that holding. *See Continental Cas. Co. v. Advance Terrazzo & Tile Co., Ins.*, 462 F.3d 1002, 1007–10 (8th Cir.2006) (refusing to consider policy arguments & precedent from other jurisdictions in construing pollutant exclusion as matter of state law).

Applying *City of Chesapeake*, the Court must determine whether there has been a "[d]ischarge, dispersal, seepage, migration, release or escape of pollutants" within the meaning of the pollutant exclusion. (Compl. Ex. A at 8.) Defendant argues that the pollutant exclusion does not apply because Chinese Drywall is not a contaminant or a pollutant. (Def.'s Br. at 28.) While counsel gets points for creativity, the Court rejects this argument. Although the Drywall itself may not be a pollutant, the gases it releases are. There is no dispute that the Chinese Drywall has released reduced sulfur gases into the Ward Residence. (*See* Hejzlar Dec. ¶ 9; Def.'s Br. at 4.) Both state and federal authorities recognize reduced sulfur gases as pollutants.[8] *See, e.g.*, Standards of Performance for Kraft Pulp Mill: Standard for Total Reduced Sulfur (TRS), 40 C.F.R. § 60.283 (2000) (regulating emission of "total reduced sulfur"); Prevention of Significant Deterioration Areas, 9 Va. Admin. Code § 5–20–205 (2010) (listing reduced sulfur gases as "criteria pollutants"). Moreover, the broad definition of pollutants in the Policy includes "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

---

**8.** Reduced sulfur gases are gaseous compounds in which sulfur is present in a lower oxidation state. Long-term exposure to reduced sulfur gas has been found to cause health problems. *See* Kaye H. Kilburn, *Hy-*

*drogen Sulfide and Reduced–Sulfur Gases Adversely Affect Neurophysiological Functions*, Toxicology and Industrial Health, Vol. 11, No. 2, 185–197 (1995).

(Compl. Ex. A at 8.) Under any reasonable definition of these terms, the gases released into the Ward Residence qualify as irritants and contaminants.[9]

For similar reasons, the Court rejects Defendant's argument that there has been no discharge or dispersal because "there are no facts suggesting any movement by the" Chinese Drywall. (Def.'s Br. 29 n. 34.) It is obvious that the relevant dispersal or discharge in this case is the discharge and dispersal of sulfuric gas from the Drywall. *See, e.g., Peace ex rel. Lerner v. Northwestern National Insurance Co.*, 228 Wis.2d 106, 596 N.W.2d 429 (1999) (holding that lead in paint that chips, flakes, or is reduced to dust is a pollutant). It is an undisputed fact that the Chinese Drywall in Defendant's home has "off-gassed," dispersing and discharging sulfuric gases into the Ward Residence. (*See* Hejzlar Dec. ¶ 7; *Ward v. Peak Building Corp.*, No. CL09–5167, Compl. ¶ 11.)

### 6. *Ensuing Loss*

█ After listing the latent defect, pollution, and corrosion exclusions in Policy Section 2.b, the Policy states that "[u]nder 2.b. above, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered." The faulty material exclusion is subject to a similar clause, which states that "any ensuing loss which is not excluded by any other provision in this policy is covered."

Defendant argues that even if the exclusions listed above allow "TravCo to exclude insuring the [Chinese Drywall], it still must pay for damages caused by the ensuing loss to other components of the home." (Def.'s Br. at 17.) In response, Plaintiff argues that the ensuing loss provision does not apply if "there was no subsequent ensuing cause of loss separate and independent from the initial excluded cause of loss." (Pl.'s Br. at 17) (quoting *Weeks v. Co-Operative Ins. Cos.*, 149 N.H. 174, 817 A.2d 292, 296 (2003)).

The ensuing loss provisions in the Policy only provide coverage for a loss if three conditions are met. First, the loss must be "ensuing." Second, the loss cannot be "excluded by any other provision" in the Policy. Finally, if the loss ensues from an original loss excluded by the latent defect, corrosion, or pollutant exclusion, the loss must be a loss to "property described in Coverages A and B." Applying the language of the Policy to the facts at hand, the Court finds that the ensuing loss provisions are not applicable for two reasons.

First, none of the losses claimed qualify as "ensuing" losses. An ensuing loss is a loss that occurs subsequent in time to an initial loss.[10] In the present case, only a

---

9. A contaminant, as that term is used in insurance contracts, is a "substance that, because of its nature and under the particular circumstances, was not generally supposed to be where it was located and caused injurious or harmful effects to people, property, or the environment." *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 286 Mich.App. 287, 778 N.W.2d 275 (2009). The sulfur gas in the Ward Residence clearly fits within this definition, because it was not "supposed to be" in the Residence and it has harmed Defendant and the components of his home. Similarly, an irritant is a substance that is capable of causing physical irritation. The sulfur gas in the Ward Residence has given Defendant and his family nosebleeds; accordingly, it is an irritant.

10. The word "ensuing" can carry two different meanings in ordinary English usage. One meaning is "[i]mmediately subsequent, coming next." Oxford English Dictionary, 2d Ed., 1989. Another meaning is simply "[r]esulting." "Because the meaning of 'ensuing' need not—but may—imply a causal component, an 'ensuing loss' need not—but only may—be a loss causally related to an earlier cause, excluded or otherwise. All that may be required for an ensuing loss is that it occurred later in time." *TMW Enterprises, Inc. v. Federal Ins. Co.*, No. 07–CV–12230, 2009 WL 928227 (E.D.Mich. Mar. 31, 2009).

single claimed loss has occurred. The Chinese Drywall released reduced sulfur gases which harmed Defendant, members of his family, and items of personal property inside the Ward Residence. Although this damage occurred gradually over a period of time, it still represents a single discrete loss from a single discrete injury, namely the off-gassing of defective Chinese Drywall. *See Prudential Prop. & Cas. Ins. Co. v. Lillard–Roberts,* No. CV–01–1362, 2002 WL 31495830 (D. Or. June 18, 2002) (finding mold to be subject to water exclusion because "mold, unlike fire, is not an 'ensuing loss' due to the lack of any intervening cause other than time beyond the initial water damage"); *cf. GTE Corp. v. Allendale Mutual Ins. Co.,* 372 F.3d 598, 613–614 (3d Cir.2004) (finding that ensuing loss provision does not cover expenses of correcting excluded design defect); *Acme Galvanizing v. Fireman's Fund Ins. Co.,* 221 Cal.App.3d 170, 270 Cal.Rptr. 405, 411 (1990) ("We interpret the ensuing loss provision to apply to the situation where there is a "peril," i.e., a hazard or occurrence which causes a loss or injury, separate and independent...."); *Wright v. Safeco Ins. Co.,* 124 Wash.App. 263, 109 P.3d 1, 7 (2004) (denying coverage under mold exclusion because "Wright has not introduced any evidence of a supervening cause that broke the causal connection between the construction defects and the mold damage").

Second, even if the losses to the components of the Ward Residence could somehow be characterized as "ensuing losses," they would still be losses "excluded by any other provision" in the Policy—specifically, the corrosion exclusion.[11] However the chain of events is structured, the damage to the metallic components of Defendant's

Residence is a loss caused by the "action or process of corroding." Thus, this loss is subject to the corrosion exclusion even if the other exclusions—pollutant, faulty materials, or latent defect—are set aside under the ensuing loss provision. *See Smith v. Westfield Ins. Co.,* No. 06–3077, 2007 WL 1740816 (E.D.Pa. June 15, 2007) ("Here, the policy specifically excludes coverage for 'mold'.... So, if the damage to the interior of the house is itself mold or wet rot, even if the damage is an 'ensuing loss' from the faulty construction, is it not covered by the policy."); *Wright,* 109 P.3d at 7("Because Wright's policy contains a provision that specifically excludes damages caused by mold, the ensuing loss provision of the exclusion in Wright's policy does not cover mold damages.").

To the extent that Defendant argues that the ensuing loss provisions create coverage for the damage to his televisions, his argument is without merit for a third reason. The damage to the televisions is not covered by the Policy, because none of the seventeen enumerated causes in Coverage C for personal property applies. An ensuing loss provision does not create coverage where none exists. Rather, an ensuing loss provision operates as an exception to an exclusion, restoring coverage that has otherwise been removed by an exclusion. *See Weeks v. Co–Operative Ins. Companies,* 149 N.H. 174, 817 A.2d 292, 296 (2003) (ensuing loss provision "operates to *restore* coverage if the damage ensues from a covered cause of loss" (emphasis added)); *Wright,* 109 P.3d at 5 ("Ensuing loss provisions are exceptions to policy exclusions and should not be interpreted to create coverage."). Because the damage to the Defendant's televisions would not be covered even in the absence of any exclu-

---

11. Depending on the causal theory, other exclusions might also apply. For example, if the Court were to somehow construe the installation of defective Drywall and the release of sulfuric gas as separate losses, the pollutant exception would also apply to the "ensuing" release of toxic gas.

sions, the ensuing loss provision cannot provide coverage.

The Court emphasizes the narrowness of its holding. The damage to Defendant's property is extensive, and the secondary consequences may not be fully realized at this point. The Court cannot speculate as to whether some of these secondary losses might qualify for coverage under the ensuing loss provision. Rather, the Court must confine its inquiry into the question of whether Plaintiff is entitled to the declaratory relief it seeks.

On the basis of the facts in the record, the Court concludes that Plaintiff is entitled to the relief requested, with one important caveat. Plaintiff requests a "a declaratory judgment that the Policy does not provide coverage for any damage caused by the Drywall in the Ward Residence or for any damage caused by the discharge of gas from the Drywall, including but not limited to any damage to wiring and copper components of the home." To the extent that this declaration might suggest that the Policy does not cover "any ensuing loss to property described in Coverages A and B not excluded by any other provision in" the Policy, the Court must deny this request for relief. If, for example, a thief were to notice the Ward Residence is empty and decide to rob the house, this loss might be covered as an ensuing loss—even though it would arguably be a loss "caused" by the Drywall. At present, there is no indication that Defendant has a potential claim for any such secondary losses. But in an abundance of caution, the Court will phrase its declaratory judgment so as not to preclude such claims should any arise.

For the foregoing reasons, the Court finds that the ensuing loss provision does not apply to any of Defendant's claimed losses. The Court expresses no opinion on whether the provision might apply to other as-yet-unclaimed losses.

## V. CONCLUSION

Plaintiff's Motion for Summary Judgment is hereby **GRANTED IN PART, DENIED IN PART.** The Court hereby enters a declaratory judgment as follows:

1. The Policy does not provide coverage for the cost of removing and/or replacing the Drywall in the Ward Residence;

2. The Policy does not provide coverage for the damage claimed by Mr. Ward to the air conditioning equipment at the Ward Residence, which resulted from corrosion;

3. The Policy does not provide coverage for the damage claimed by Mr. Ward to the garage door at the Ward Residence, which resulted from corrosion;

4. The Policy does not provide coverage for the damage claimed by Mr. Ward to the flat screen televisions; and

5. The Policy does not provide coverage for any presently claimed damages caused by the Drywall in the Ward Residence or for any presently claimed damage caused by the discharge of gas from the Drywall, including but not limited to any damage to wiring and copper components of the home.

**IT IS SO ORDERED.**